UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
JONATHAN FLEISIG and CONDOR ALPHA      :
ASSET MANAGEMENT,                      :
                                       :        19cv8217 (DLC)
                        Plaintiffs,    :
                                       :        OPINION AND ORDER
            -v-                        :
                                       :
ED&F MAN CAPITAL MARKETS, INC.,        :
                                       :
                        Defendant.     :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiffs and counterclaim defendants Jonathan Fleisig and
Condor Alpha Asset Management:
Kevin P. Conway
Conway & Conway
99 Park Avenue, 25th Floor
New York, NY 10016

For defendant and counterclaim plaintiff ED&F Man Capital
Markets, Inc.:
Therese M. Doherty
LisaMarie Collins
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue
New York, NY 10017

DENISE COTE, District Judge:

    Plaintiffs Jonathan Fleisig and Condor Alpha Asset

Management ("Condor") have sued ED&F Man Capital Markets, Inc.

("MCM"), alleging breach of contract and commercial tort claims

arising out of a futures trading relationship that soured.  MCM

has counterclaimed for breach of contract.  This Opinion

presents the Court's findings of fact and conclusions of law
following a bench trial held on June 28 and June 29, 2021.  For
the following reasons, judgment is granted to MCM.

## Background

Jonathan Fleisig, a futures trader, is the sole owner of
Condor, an asset manager.  Beginning in 2015, the plaintiffs
used MCM as their clearing broker.  This litigation arises out
of the collapse of that relationship.

The plaintiffs allege a number of contract and tort claims
against MCM stemming from two sets of wrongful acts.  First, the
plaintiffs allege that MCM improperly allowed Jared Plutzer, an
MCM risk officer, to trade futures using Condor's account.
Second, the plaintiffs allege that MCM breached its contract
with the plaintiffs by restricting their ability to trade in
their account with MCM.  They claim to have suffered $2,029,659
in damages as a result of this misconduct.  In its
counterclaims, MCM seeks $1,762,266.57 in damages from Condor
and $803,113.81 in damages from Fleisig.  MCM also seeks
contractual indemnification from Condor and attorneys' fees and
costs from both plaintiffs.

The plaintiffs commenced this lawsuit on September 4, 2019.
Their complaint asserted claims against both MCM and Paragon
Global Markets, LLC ("Paragon"), an introducing broker that

connected the plaintiffs to MCM.  After the plaintiffs twice amended their complaint, Paragon moved to dismiss on December 31, 2019, and MCM asserted counterclaims on the same day.

An Opinion and Order of June 12, 2020 dismissed the plaintiffs' claims against Paragon.  Fleisig v. ED&F Man Capital Markets, Inc., No. 19cv8217, 2020 WL 3127875 (S.D.N.Y. June 12, 2020).  Pursuant to a stipulation between the parties, MCM filed an amended answer and counterclaims on July 14, 2020.

Following the conclusion of discovery,[1] the parties filed their joint pretrial order on April 16, 2021 in anticipation of a bench trial.[2]  MCM timely filed its proposed findings of fact

---

[1] On April 7, 2021, shortly before the joint pretrial order deadline of April 16, plaintiffs' counsel moved to withdraw.  In his motion, plaintiffs' counsel cited as a basis for withdrawal disputes over the scope of discovery, among other things.  The plaintiffs opposed the request by their counsel.  In an Order of April 8, the motion was conditionally denied.  The Court stated that the motion would be granted, and the deadline to file the joint pretrial order extended, if replacement counsel appeared on behalf of the plaintiffs or the plaintiffs filed a request to proceed pro se.  The parties were further informed that an application to reopen discovery would not be granted.  The plaintiffs' counsel did not withdraw.

[2] The plaintiffs' operative complaint, which includes claims against both MCM and Paragon, includes a jury demand.  But, in a customer agreement between Condor and MCM and a guaranty agreement between Fleisig and MCM, both plaintiffs waived their rights to a jury trial.  In a letter of June 29, 2020, following the dismissal of the plaintiffs' claims against Paragon, the parties confirmed that trial in this action would be a bench trial.

and conclusions of law on April 16,[3] and the plaintiffs belatedly did so on April 23.[4]  MCM provided the Court with the affidavits constituting the direct testimony of its witnesses and the exhibits constituting its evidence in chief on April 16, and the plaintiffs did so on June 14.

A bench trial commenced on June 28 and concluded on June 29.  With the consent of the parties, and in accordance with this Court's Pretrial Scheduling Order of July 2, 2020, trial was conducted as prescribed by this Court's Individual Practices in Civil Cases, which include the presentation of direct testimony of witnesses by affidavit.

The plaintiffs presented the affidavit of Jonathan Fleisig. MCM presented the affidavits of Thomas A. Hayes, its General Counsel, and of Stephen Hood, its Chief Risk Officer.  Each witness appeared at trial and was made available for cross-examination.  The findings of fact appear principally in the

---

[3] MCM filed a corrected version of its proposed findings of fact and conclusions of law on April 19.

[4] On April 26, MCM objected to the plaintiffs' proposed findings of fact and conclusions of law as untimely.  On May 10, MCM filed a motion in limine that sought to exclude from trial four exhibits that were not produced in discovery.  On June 15, MCM objected to Fleisig's affidavit of direct testimony as untimely. In an Order of June 18, the Court excluded the four exhibits cited in MCM's motion in limine and struck portions of the Fleisig affidavit and the plaintiffs' proposed findings of fact and conclusions of law.

following section, but are also addressed as needed in the Discussion.

### Findings of Fact

Fleisig, the sole shareholder of Condor, is an experienced commodity futures trader.  In the commodity futures market, Condor acted in part as a "market maker" that executed futures trades in order to provide liquidity to participants in the futures market.  Condor and Fleisig stood to collect both revenue from their trading profits and rebates of exchange fees offered by exchanges to market makers.

I.   Condor and Fleisig Enter Into Agreements with MCM.

On August 27, 2015, Condor opened a corporate trading account with MCM.[5]  Condor was introduced to MCM by an introducing broker, Paragon.  Fleisig, as Condor's "Owner/Trader", executed the account application on behalf of Condor.  The application also lists Fleisig as the sole person authorized to act on behalf of the account.

---

[5] This account consisted of eighteen subaccounts, which allowed Condor to separate trading strategies or the activities of individual traders.  The accounts were all netted against each other and margined under a single account number.  For the purposes of this Opinion, there are no relevant differences between the subaccounts, and the accounts are collectively referred to as the "Condor MCM" account.

A.   The Condor Customer Agreement

In opening an account with MCM, Fleisig, on behalf of Condor, entered into a Customer Agreement.  Pursuant to the Customer Agreement, Condor agreed

> to maintain, without demand from [MCM], such margin, cash, or other acceptable Collateral . . . as [MCM], in our sole and absolute discretion, may require from time to time, the amount of which may, in [MCM's] sole and absolute discretion, exceed any amount that may be required by Applicable Law and may differ from any such amount charged to or imposed on any other customer.[6]

Condor also agreed "to pay [MCM] the reasonable costs and expenses of collection, including attorney's fees, for any unpaid debits, charges, and other amounts that [it] may at any time owe" to MCM, as well as to "pay on demand, whether written or oral, any debit balances in [Condor's] Account."  The Agreement further provided that MCM "may change margin requirements in [its] sole and absolute discretion, at any time," and that Condor would "deposit with [MCM] such additional margin when and as required and demanded by [MCM] . . . and . . . . immediately meet all margin calls in such manner as [MCM] shall designate in [its] sole and absolute discretion."

---

[6] "Margin" is the "[c]ash or collateral required to be paid to a securities broker by an investor to protect the broker against losses from securities bought on credit."  Margin, Black's Law Dictionary (11th ed. 2019).  As described later in this Opinion, MCM issued a line of credit to Condor to cover Condor's margin requirements.

The Agreement permitted MCM to, among other things, "sell any or all futures Contracts, commodities, or securities held or carried for" Condor in the event that MCM concluded that Condor had provided "insufficient margin", offered inadequate collateral, or if "any other circumstances or developments" occurred that MCM deemed "to require action necessary for [its] protection."   MCM was authorized by the Agreement to take any of these actions in its "sole and absolute discretion."

Under the Agreement, Condor was "at all times . . . liable for the payment of any debit balance upon demand" by MCM, and if MCM liquidated Condor's account pursuant to the Agreement, Condor remained "liable for any deficiency remaining in [its account] in the event of liquidation thereof in whole or in part."  If liquidation of Condor's account proved insufficient to satisfy Condor's liabilities to MCM, Condor was obligated to "promptly . . . pay, upon demand, the deficit and all unpaid liabilities, together with interest thereon and all costs of collection including reasonable attorneys' fees."

MCM was also permitted to "restrict or prohibit trading in, or close, [Condor's] Account for any reason whatsoever."  This provision contemplated that restrictions on Condor's account may include "limit[s] [on] the number of transactions and positions . . . execute[d], exercise[d], clear[ed] and/or carr[ied]" by

MCM for Condor, and that MCM could impose those limits in its "sole and absolute discretion."

An indemnification provision was also included in the Agreement.  Pursuant to the indemnification provision, Condor agreed to

> indemnify and hold harmless [MCM] from and against any liability, damage, cost, or expense (including, without limitation, legal fees and expenses, amounts paid in settlement of any claims, interest, and any fines or penalties imposed by any Transaction Facility, self-regulatory agency or organizational or governmental agency) incurred as a result of [Condor's] violation of any of your representations, agreements, or obligations under this Agreement.

Condor also "agree[d] to pay . . . any direct or indirect costs of collection, defense, and enforcing any of [MCM's] rights under this Agreement including, but not limited to, interest, legal fees, court costs, and other expenses."

Finally, because Condor was introduced to MCM by Paragon, the Agreement provided that MCM's role was that of a clearing broker responsible for "execution, clearing, and bookkeeping for transactions made pursuant to instructions from [Condor] or [Paragon]."  Condor "agree[d] to look solely to [its] introducing broker for redress of any loss or damages arising out of circumstances other than [MCM's] willful misconduct in the execution, clearance, or bookkeeping of transactions."

B.   The Fleisig Guaranty Agreement

Fleisig agreed on August 27, 2015 to guarantee Condor's MCM account.  Pursuant to the guaranty agreement (the "Guaranty"), Fleisig

> unconditionally and absolutely guarantee[d] the
> punctual payment when due in full (in immediately
> available funds), whether at stated maturity, by
> acceleration or otherwise, of all of [Condor's]
> indebtedness, liabilities and other obligations
> arising under the [Customer] Agreement, any other
> document, instrument or agreement required to be
> executed or delivered in connection therewith . . .
> any transactions entered into under the [Customer]
> Agreement and any and all reasonable legal fees,
> costs, and other expenses incurred by [MCM] in
> enforcing the Transaction Documents, protecting the
> rights of Secured Party under the Transaction
> Documents or otherwise . . . .

Fleisig also waived "any requirement that suit be brought against, or any other action by [MCM]" be taken against Condor, as a condition" to his obligations under the Guaranty, as well as "any other . . . circumstance which otherwise may constitute a legal or equitable defense or a guarantor or surety (except for the defense of payment or performance)".

C.   The Condor Credit Agreement

On March 18, 2016, Condor entered into a credit agreement with MCM (the "Credit Agreement").  Under the Credit Agreement, MCM agreed to extend a line of credit, up to $2,500,000, to Condor to satisfy the margin requirements for Condor's accounts

with MCM.  Fleisig executed the Credit Agreement on behalf of Condor.

II.  Jared Plutzer Trades on Behalf of Condor.

In late 2016, Fleisig became reacquainted with Jared Plutzer.  Plutzer was employed by MCM as a risk officer but had previously worked for Fleisig as an intern while a college student.  Plutzer informed Fleisig that he had formulated a strategy for trading electricity futures, and that he was considering leaving MCM to pursue this strategy with a trading firm.  On January 24, 2017, Plutzer, using his personal email address, emailed Fleisig with details of his proposed trading strategy.

Fleisig was interested in Plutzer's strategy but was reluctant to hire Plutzer to pursue the strategy on behalf of Condor unless Plutzer could prove himself as a trader.  Instead of hiring Plutzer, Fleisig decided to allow Plutzer to test his strategy while simultaneously working at MCM.  On February 7, 2017, Plutzer emailed Fleisig and said that he could "get away with . . . doing small size" trading on behalf of Condor while still employed as a risk officer for MCM.

Although both Fleisig and Plutzer knew that Plutzer was not allowed to trade using an MCM customer account, Fleisig agreed to let Plutzer use the Condor MCM account to trade in accordance with his strategy while still employed by MCM.  In order to do

so, Fleisig opened a sub-account of the Condor MCM account for
Plutzer's use and gave Plutzer his MCM login ID and password so
that Plutzer could access the account.  Fleisig's speculation at
trial that Plutzer's MCM colleagues must have known that Plutzer
was trading in the Condor MCM account because the risk officers
at MCM worked in an open "bullpen" setting is just that,
speculation.  Fleisig admits that neither he nor Plutzer
informed anyone at MCM that Plutzer was using Condor's account
to demonstrate his trading skill to Fleisig and obtain a job at
Condor.[7]  Although he had executed written authorization for
Condor employees to use the MCM account in the past, Fleisig
never provided to MCM written authorization for Plutzer to trade
using the MCM account.

Condor suffered losses as a result of Plutzer's trading
activity.  Fleisig was aware of the losses as they were
incurred, and at first encouraged Plutzer to continue trading.
But beginning in May 2017, Fleisig began to demand that Plutzer

---

[7] Over the course of the period that Plutzer traded in the Condor
MCM account, Plutzer repeatedly made it known to Fleisig that
his use of the account was not sanctioned by MCM.  On multiple
occasions, Plutzer sent text messages to Fleisig informing him
that he "couldn't execute" trades in the account because he had
"[MCM Chief Risk Officer Stephen] Hood standing over [him.]"
Plutzer also told Fleisig that he could "face regulatory
consequences" as a result of his trading in the Condor MCM
account and expressed a desire to stop trading until Condor
could hire him as an employee.  Fleisig encouraged him to
continue and promised to hire him if he were banned from serving
as a risk officer as a result of his trading.

reimburse Condor for its losses, and Fleisig asserts that Plutzer agreed to do so.  In May 2017, Condor incurred losses approaching $1 million as a result of Plutzer's trading activity.  By June 30, 2017, Fleisig no longer allowed Plutzer to trade.  Thereafter, Fleisig continued to demand that Plutzer reimburse Condor for the losses suffered as a result of his trading.

It is not disputed that Fleisig did not make a demand to MCM for reimbursement of Plutzer's losses until shortly before he filed this action in 2019.  Indeed, Fleisig did not disclose Plutzer's use of the Condor MCM account to MCM until 2019.[8] After MCM learned in 2019 that Plutzer had traded in the Condor MCM account, MCM fired Plutzer.

III. Condor Suffers Losses, Defaults, and Enters Into an Agreement with MCM.

In September 2018, over a year after Plutzer stopped trading in the Condor MCM account, Condor suffered a series of losses as a result of its trading activities.  On September 1, the net liquidation value of the Condor MCM account was positive.  Condor incurred a series of significant losses in September 2018, on one occasion losing $1.3 million in a single

---

[8] Fleisig did not disclose Plutzer's conduct to MCM until, as described later in this Opinion, MCM had shut down the Condor MCM account, obtained a judgment against him, and sought to collect that judgment.

trade.  In recognition of the enormity of this loss, Fleisig at trial identified this trade as his "black swan" trade.[9]  By September 27, the Condor MCM account had a negative net liquidation value of $959,152.76.  MCM issued a margin call[10] to Condor on September 28, and Condor did not satisfy it.  On September 28, MCM sent a letter to Fleisig demanding, pursuant to the Guaranty, payment of the $959,152.76 debt incurred by Condor.

Fleisig did not pay.  Instead, on October 5, having consulted with an attorney, he executed on behalf of Condor and himself an agreement with MCM (the "October 2018 Agreement"). Condor's September 2018 losses led MCM to decide to terminate its relationship with Condor.  The specific conditions imposed in the October 2018 Agreement constituted the most effective means by which MCM could reduce the risk associated with the positions held in the Condor MCM account, recoup its losses, and wind down its relationship with Condor in an orderly fashion. In the October 2018 Agreement, Fleisig acknowledged that he was

---

[9] A "black swan" is a term commonly used in the financial industry to refer to a rare or improbable event.  Black swan, Oxford English Dictionary Online (March 2021), www.oed.com/view/Entry/282957.

[10] A "margin call" is "[a] securities broker's demand that a customer put up money or stock as collateral when the broker has financed the purchase of securities."  Call, Black's Law Dictionary (11th ed. 2019).

liable for the $959,152.76 debt as Condor's guarantor.  MCM, in turn, agreed that it would not seek to collect immediately the $959,152.76 from either Condor or Fleisig, subject to certain conditions.

Under the October 2018 Agreement, Condor was required to pay $50,000 per month, and $300,000 per quarter, to MCM until the debt was paid in full.  The funds were either to be paid out of cash held by Condor in its non-MCM accounts and transferred to the Condor MCM account or paid out of any rebates Condor received in the Condor MCM account for its market making activities.  Under the terms of this agreement, then, Condor's debt would be reduced to $609,152.76 by January 31, 2019.

The October 2018 Agreement further provided that, until the debt was paid, Condor would be limited in the amount of money it could withdraw from the Condor MCM account each month and would provide an itemized schedule of its monthly expenses to MCM. Condor was also forbidden from holding certain types of high-risk positions and making certain types of risky trades.  For instance, it could not trade certain futures contracts with long expiration dates, and it was required to reduce its exchange for swap ("EFS") position by at least 4,500 contracts per month.

Finally, the October 2018 Agreement required that Fleisig execute an affidavit of confession of judgment in the amount of

$959,152.76.  The affidavit was to be held in escrow pending payment of the $959,152.76 obligation, but if Condor defaulted on the October 2018 Agreement, the affidavit would be released from escrow and filed in New York state court.  All other provisions of the Customer Agreement and the Guaranty remained in effect.  Fleisig executed the October 2018 Agreement and the affidavit of confession of judgment.

Despite the restrictions created by the October 2018 Agreement, Condor received between October 5, 2018 and February 8, 2019 approximately $1 million in rebates for its market making activities.  But Condor did not use these funds to pay MCM as required by the October 2018 Agreement.  During that same period, $570,167 was transferred from the Condor MCM account to a Condor bank account.  By October 31, 2018, the value of the Condor MCM account had further decreased, from a negative net liquidation value of $959,152.76 to a negative net liquidation value of $1,121,000.96.  On November 23, 2018, MCM issued another margin call, for $1,375,007.08.  Condor did not satisfy the margin call, and instead entered into a revised credit agreement with MCM that increased its credit line from $2,500,000 to $3,250,000.

By January 31, 2019, the value of the Condor MCM account had not improved from its October 5, 2018 negative net

liquidation value of $959,152.76.  By February 4, the negative
net liquidation value was $1,151,028.25.  To stave off an
immediate declaration of default and liquidation of the Condor
MCM account, on February 8, 2019, Fleisig and Condor entered
into a supplemental agreement with MCM that modified the terms
of the October 2018 Agreement (the "February 2019 Agreement").
Under the terms of the February 2019 Agreement, Condor and
Fleisig acknowledged that Condor owed $1,151,028 to MCM.

In return for MCM's agreement that it would not seek
immediately to collect Condor's debt from Condor or Fleisig,
Condor agreed that it would continue to make the payments set
out in the October 2018 Agreement, and that its debt would
decrease by a minimum of $75,000 per month and $300,000 per
quarter.  Condor further agreed that the value of the Condor MCM
account would never equal a negative net liquidation value
greater than $1,151,028, and that its maximum negative net
liquidation value would decrease monthly as payments were made.
If trading activities increased the negative net liquidation
value above this cap, Condor agreed to deposit cash into the
account to reduce the negative net liquidation value.  The
agreement also included a cap on monthly withdrawals.

Additionally, Condor agreed that any market making rebates
it earned would be transmitted to the Condor MCM account, and

not to any other account, until the account's negative net
liquidation value was reduced below $500,000.  The agreement
also prohibited Condor from making trades resulting in trading
losses greater than a certain percentage of its market making
rebates.  It also imposed limits on the types and quantities of
futures that could be held or traded, including an obligation to
further reduce the EFS position.

Finally, Condor was required to provide MCM with frequent
updates on its financial performance and revenue received.  If
Condor failed to cure a violation of any of the terms of the
February 2019 Agreement within 24 hours of occurrence, Condor
and Fleisig would be immediately liable for the full sum of all
of their obligations to MCM.  All other provisions of the
October 2018 Agreement, the Customer Agreement, and the Guaranty
remained in effect.

On February 26, 2019, Condor received a rebate of $368,747.
Instead of transferring this money to the Condor MCM account in
accordance with the terms of the February 2019 Agreement, Condor
transferred this money to its Wells Fargo Bank account.  MCM
demanded that the full rebate be sent to the Condor MCM account.
Condor later transferred a portion of this money to the Condor
MCM account but did not return the full sum of $368,747; Fleisig
claimed he had no money and had used the rebate funds to pay his

employees' salaries.  By February 28, 2019, Condor had transferred $310,000 of the rebate to the Condor MCM account, but $58,747 remained due to MCM.

At the close of business on February 28, 2019, the Condor MCM account had a negative net liquidation value of $1,368,745.36.  This violated the February 2019 Agreement, which explicitly required that the negative net liquidation value in the Condor MCM account be no greater than $1,076,028 at the close of business on February 28, 2019.  In a letter of March 1, 2019, MCM demanded that, within 24 hours, Condor cure its breach of the February 2019 Agreement by transmitting to MCM the $58,747 remaining from the February 26 rebate and paying $292,717 to MCM to bring the Condor MCM account negative net liquidation value below $1,076,028.  Condor did not do so.

IV.  MCM Liquidates the Condor Account.

After Condor's February 28 default, MCM disabled Condor's ability to trade using the Condor MCM account.  On March 4, 2019, shortly after Condor's trading privileges were revoked, the negative net liquidation value was $1,397,917.23.  There were approximately 83,000 futures contracts in the account.

Between March 4, 2019 and April 5, 2021, MCM liquidated most of the futures positions held in the Condor MCM account, pursuant to § 5 of the Customer Agreement.  It did so over a period of months, as it concluded that immediate liquidation

would result in greater trading losses.  Adopting the liquidation strategy that it observed Fleisig to have used, MCM liquidated the account by offsetting each position near the expiration date of each contract in the account, or by letting the contract expire.

As a result of the liquidation, MCM incurred a trading loss of $635,858.00.  Condor also incurred finance facility interest, fees, and trading account interest charges totaling $371,579.17.  As of April 5, 2021, the MCM Condor account had a negative net liquidation value of $1,762,266.57.[11]  On that date, the account only held approximately 160 contracts.

On March 12, 2019, MCM filed in New York state court the affidavit of confession of judgment signed by Fleisig as a condition of the October 2018 Agreement.  A judgment of $959,377.76 -- Condor's debt as of September 27, 2018 -- was entered against Fleisig on April 2, 2019.  The April 2, 2019 judgment (the "Judgment") against Fleisig has not been satisfied,[12] and MCM has obtained no other judgment against Fleisig or Condor.

---

[11] This negative net liquidation value accounts for $700,000 recovered by MCM from a third-party guarantor of Condor.

[12] The sole asset recovered by MCM pursuant to the April 2, 2019 judgment is 312,500 shares of FaceCake, a non-public company. MCM has been unable to value those shares.

## **Discussion**

The parties allege a number of claims and counterclaims, which are logically divided into three groups: the plaintiffs' claims arising out of Plutzer's use of the Condor MCM account to trade futures, the plaintiffs' claims stemming from MCM's restriction and subsequent closure and liquidation of the Condor MCM account, and MCM's contractual counterclaims.  These three sets of claims are addressed in turn.

Before addressing the substantive claims in this action, the Court must resolve a threshold issue of choice of law. Three of the relevant agreements in this case -- the Customer Agreement, the Guaranty, and the Credit Agreement that gave Condor access to credit to satisfy its margin requirements -- contain forum selection clauses and choice of law provisions. The Guaranty and the Credit Agreement contain New York choice of law provisions and New York forum selection clauses.  The Customer Agreement, by contrast, contains an Illinois choice of law provision and a mandatory forum selection clause requiring that any litigation arising out of or related to the Customer Agreement occur in Chicago, Illinois.  The parties' trial submissions, however, rely entirely on New York law, and no party has argued that the forum selection clause of the Customer Agreement requires litigation in Chicago.  This Court will apply New York law.  <u>See Alphonse Hotel Corporation v. Tran</u>, 828 F.3d

146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law").

I.   The Plaintiffs' Claims Related to Plutzer

The plaintiffs bring claims for fraud, negligence, breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, and negligent misrepresentation stemming from Plutzer's trading in the Condor MCM account. These claims are barred by the contractual limitations period.[13]

A.   The Contractual Limitations Period

In the Customer Agreement, Condor agreed that it would "not bring any action, regardless of form, arising out of or relating

---

[13] Although the Court resolves the plaintiffs' Plutzer-related claims based on the relevant contractual limitations period, the claims would also fail on the merits.  Among other reasons, the evidence adduced at trial made clear that Plutzer's allegedly tortious conduct was conducted without MCM's knowledge and outside of the scope of his duties as a risk officer.  Under New York law, a company is only liable "for tort committed by its servants or agents acting within the scope of their service or agency."  DDJ Mgmt., LLC v. Rhone Grp. L.L.C., 78 A.D.3d 442, 444 (1st Dep't. 2010) (citation omitted).

Moreover, the evidence indicated that Fleisig repeatedly encouraged Plutzer to trade in the Condor MCM account despite knowing that Plutzer was forbidden by MCM from doing so and that Plutzer had to conceal his trading from MCM.  "[I]mplicit in every contract is a covenant of good faith and fair dealing" which prohibits a party from violating the counterparty's "presumed intentions or reasonable expectations."  Spinelli v. Nat'l Football League, 903 F.3d 185, 206 (2d Cir. 2018) (citation omitted).  Even assuming Plutzer's conduct constituted a breach of the contract between Condor and MCM, Fleisig's bad faith conduct induced the breach and bars any recovery.

to [the Customer Agreement] or transactions hereunder more than
one year after the cause of action arose."  Under New York law,
the parties to a written agreement may prescribe a shorter
limitations period for commencing an action related to that
agreement than the period prescribed by the statute of
limitations.  N.Y. C.P.L.R. § 201.  Such agreements must be
enforced, "absent proof that the contract is one of adhesion or
the product of overreaching, or that the altered period is
unreasonably short."  Top Quality Wood Work Corp. v. City of New
York, 191 A.D.2d 264, 264 (1st Dep't. 1993) (citation omitted).
Here, the contractual limitations provision is enforceable.  The
one year limitations period prescribed by the Customer Agreement
is not unreasonably short, see Top Quality, 191 A.D.2d at 264
(an agreement providing for a six month limitation period is not
unreasonably short), and the plaintiffs have provided no
argument or evidence that the prescribed limitations period is
otherwise unreasonable.

The contractual limitations period applies to both
contractual claims and commercial tort claims, such a fraud
claim.  The provision applies to "any action[s], regardless of
form" that "aris[e] out of or relat[e] to [the Customer
Agreement]."  The Second Circuit has held that similar language
"is sufficiently broad to cover tort claims as well as contract

22

claims" related to an agreement.  Turtur v. Rothschild Registry
Intern., Inc., 26 F.3d 304, 310 (2d Cir. 1994).

    B.   Application to Plutzer-Related Claims

    New York law prescribes that a cause of action for fraud
accrues on the date the plaintiff "discovered the fraud, or
could with reasonable diligence have discovered it."  Aozora
Bank, Ltd. v. UBS AG, 144 A.D.3d 436, 437 (1st Dep't. 2016)
(quoting N.Y. C.P.L.R. § 213(8)).  The alleged fraud here arises
from Plutzer's trading activities in the Condor MCM account and
Condor's resulting losses.  But Plutzer's trades and the
resulting losses occurred between February and June 2017, well
over a year before this action was filed in September 2019.
Fleisig also had contemporaneous knowledge of all of the facts
relevant to any potential fraud claim: he knew that Plutzer was
trading in the Condor MCM account while employed as a risk
officer for MCM, that Plutzer was not permitted by MCM to trade
in customer accounts, that Condor incurred losses as a result of
Plutzer's trading, and that Plutzer had not reimbursed Condor
for the losses resulting from his trading.  Since Fleisig and
Condor had actual knowledge of all of the facts necessary to
bring a fraud claim by June 2017 at the latest, but did not
pursue a claim until September 2019, the fraud claim is barred
by the contractual limitations period in the Customer Agreement.

The plaintiffs' negligence, breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, and negligent misrepresentation claims are similarly time barred.  The negligence and breach of fiduciary duty claims accrued on the date when the plaintiffs suffered injury, American Home Assur. Co. v. Nausch, Hogan & Murray, Inc., 71 A.D.3d 550, 553 (1st Dep't. 2010), the contractual claims accrued upon the alleged breach of the contract, Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007), and the negligent misrepresentation claim accrued "on the date of the alleged misrepresentation which is relied upon by the plaintiff," Gerschel v. Christensen, 143 A.D.3d 555, 557 (1st Dep't. 2016). Here, all of the actionable conduct related to Plutzer's trading activities occurred on or before June 30, 2017, meaning that the plaintiffs were contractually obligated to bring any suit related to Plutzer's conduct by June 30, 2018.  Since this litigation did not commence until September 4, 2019, these claims are untimely.

II.  The Plaintiffs' Claims Related to the Account Restrictions, Closure, and Liquidation

The plaintiffs contend that MCM's imposition of restrictions on their trading in the Condor MCM account, and subsequent closure and liquidation of that account, give rise to claims for breach of contract, breach of the covenant of good

faith and fair dealing, breach of fiduciary duty, and negligent misrepresentation.[14]  All of these claims fail.

A.   Contractual Claims

Under New York law, the elements of a breach of contract claim are "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  Fleisig, 2020 WL 3127875, at *3 (quoting Nick's Garage, Inc v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017)).  The plaintiffs argue that MCM breached the October 2018 Agreement by "arbitrarily limiting [their] ability to trade" using the MCM account, and breached the February 2019 Agreement by closing the Condor MCM account despite the plaintiffs' "compliance with the [February 2019 Agreement] to the extent such compliance was possible."

Both of these claims fail.  The October 2018 and February 2019 Agreements both expressly provided that the Customer

_____

[14] The Third Amended Complaint also alleges a claim for fraud stemming from MCM's imposition of restrictions on the plaintiffs' trading activity, but that claim is not addressed in the plaintiffs' proposed findings of fact and conclusions of law.  It is therefore deemed withdrawn.  In any event, that claim would fail.  Where a fraud claim is premised on an allegation that a "defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead bring an action for breach of contract."  Spinelli, 903 F.3d at 209.  Here, any fraud claim stemming from MCM's imposition of trading restrictions arises out of MCM's purported breach of the Agreements.  The plaintiffs must therefore pursue it as a contractual claim, rather than as a distinct claim for fraud.

Agreement would remain in effect, and the Customer Agreement in turn allowed MCM to restrict Condor's ability to trade and close Condor's account at its discretion.  No provision in either the October 2018 or February 2019 Agreement supplanted the provision of the Customer Agreement that permitted MCM to "restrict or prohibit trading in, or close, [Condor's] Account for any reason whatsoever."  Because MCM did not take any action that was not expressly permitted by its contracts with the plaintiffs, the plaintiffs' claims for breach of contract are unavailing.

The claim for breach of the covenant of good faith and fair dealing also fails.  While all contracts imply a covenant of good faith and fair dealing, an action for breach of the covenant of good faith and fair dealing "cannot be maintained [when] it is premised on the same conduct that underlies [a] breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract." MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 420 (1st Dep't. 2011) (citation omitted).  Here, the plaintiffs argue that MCM breached the covenant of good faith and fair dealing by restricting the plaintiffs' ability to trade using the Condor MCM account beyond the terms of the Agreements.  But the plaintiffs also contend that this exact conduct by MCM breached

explicit provisions of the Agreements.  The claim therefore must be dismissed.

    B.  Breach of Fiduciary Duty

    To recover for a breach of fiduciary duty, a plaintiff must demonstrate "that the defendant owed him a fiduciary duty, that the defendant committed misconduct, and that the plaintiff suffered damages caused by that misconduct."  NRT New York, LLC v. Morin, 147 A.D.3d 589, 589 (1st Dep't. 2017).  The plaintiffs argue that MCM breached its fiduciary duty to them by limiting their ability to trade using the Condor MCM account, and by liquidating the positions held in the Condor MCM account in a "disorderly manner."

    The breach of fiduciary claim fails because MCM did not owe a fiduciary duty to Condor or Fleisig.  MCM acted as a clearing broker on behalf of Condor, and a clearing broker like MCM "is generally under no fiduciary duty to the owners of the securities that pass through its hands."  Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013) (citation omitted).[15]

---

[15] Although courts in this District have held that "[c]learing brokers may have a fiduciary duty to investors in certain extenuating circumstances," Rozsa v. May Davis Group, Inc., 152 F.Supp.2d 526, 531 (S.D.N.Y. 2001), the plaintiffs have not demonstrated that any of these circumstances existed here.

But even assuming that the plaintiffs could establish that
MCM was their fiduciary, this claim is defective for at least
two other reasons.  First, the plaintiffs argue that this
conduct also breached their contracts with MCM, and New York law
does not permit a plaintiff to pursue a breach of fiduciary duty
claim that is "duplicative of [a] breach of contract claim."
CIP GP 2018, LLC v. Koplewicz, 194 A.D.3d 639, 639 (1st Dep't.
2021).  Second, the plaintiffs have not shown that MCM committed
any misconduct in restricting Condor's ability to trade and then
liquidating the Condor MCM account.  The Customer Agreement
allowed MCM to restrict trading in customer accounts and
liquidate customer accounts at its sole discretion.  The
plaintiffs' losses and failure to abide by their commitments to
MCM memorialized in the October 2018 and February 2019
Agreements exposed MCM to losses exceeding $1 million.  MCM was
entitled to avail itself of its contractual right to protect
itself from even greater loss.

    C.   Negligent Misrepresentation

    In order to recover on their negligent misrepresentation
claim, the plaintiffs must "demonstrate (1) the existence of a
special or privity-like relationship imposing a duty on the
defendant to impart correct information to the plaintiff; (2)
that the information was incorrect; and (3) reasonable reliance
on the information."  Mandarin Trading Ltd. v. Wildenstein, 944

28

N.E.2d 1104, 1109 (N.Y. 2011) (citation omitted).  The
plaintiffs contend that MCM made a misrepresentation to them
when it represented in the October 2018 and February 2019
Agreements that it would impose only certain restrictions on
their trading activities, and then imposed additional
restrictions.

The plaintiffs did not show that MCM imposed any
restrictions on their trading activities beyond those identified
in the two Agreements.  But even if it were assumed that MCM in
fact imposed additional restrictions on the plaintiffs' trading,
this argument fails.  While the October 2018 and February 2019
Agreements set forth several limits on the types of trades that
could be made in the Condor MCM account, the Agreements did not
provide that the restrictions stated in the Agreements were the
only restrictions that could be imposed.  Indeed, both
Agreements expressly stated that "the Customer Agreement . . .
shall remain in full force and effect."  The Customer Agreement,
in turn, allowed MCM in its "sole and absolute discretion" to
impose "limit[s] [on] the number of transactions and positions .
. . execute[d], exercise[d], clear[ed] and/or carr[ied]" by MCM
for Condor.  Since the October 2018 and February 2019 Agreements

did not contain any incorrect information, the plaintiffs'
negligent misrepresentation claim must fail.[16]

III. MCM's Counterclaims

MCM has alleged five counterclaims against Condor and
Fleisig: claims for breach of contract against both Condor and
Fleisig, a claim for contractual indemnification against
Fleisig, and claims for contractual attorneys' fees and costs
against both Condor and Fleisig.  MCM is entitled to recover on
each claim.

A.   Breach of Contract

As noted above, in order to recover for a claim of breach
of contract, a plaintiff must demonstrate "(i) the formation of
a contract between the parties; (ii) performance by the
plaintiff; (iii) failure of defendant to perform; and (iv)
damages."  Fleisig, 2020 WL 3127875, at *3 (quoting Nick's
Garage, 875 F.3d 107 at 114).  MCM has satisfied these elements.

First, MCM has demonstrated –- and the plaintiffs do not
dispute –- that the Customer Agreement, the October 2018
Agreement, and the February 2019 Agreement constituted binding
contracts between the parties.  Second, for the reasons

---

[16] MCM also contests the plaintiffs' negligent misrepresentation
claim on the grounds that MCM was not in a special relationship
with the plaintiffs.  That issue need not be addressed because
the plaintiffs' negligent misrepresentation claim fails even if
MCM were in a special relationship with them.

described above in the Opinion's discussion of the plaintiffs'
contractual claims, MCM performed under each of the three
contracts.[17]   Third, Condor breached the agreements in several
ways.  The Customer Agreement required that Condor satisfy MCM's
margin calls, and Condor did not do so.  It also required Condor
to, upon liquidation of its account, pay on demand any remaining
liabilities to MCM, and Condor has not done so.  Additionally,
Condor failed to comply with certain provisions of the October
2018 and February 2019 Agreements requiring it to, inter alia,
reduce the negative net liquidation value of its accounts, make
minimum payments against the deficit balances, and transfer all
market maker rebates to the Condor MCM account.  Finally, MCM
suffered damages of $1,762,266.57 -- the negative net
liquidation value of the Condor MCM account as of April 5, 2021
-- as a result of the plaintiffs' breaches.

     The plaintiffs take issue with very little of this
assessment, although they make several unconvincing arguments as
to why their actions do not amount to a breach of their
agreements with MCM.  First, they argue that they did not breach
the October 2018 Agreement because the October 2018 Agreement

---

[17] As noted above, the plaintiffs allege that MCM failed to
perform under the contracts by restricting their ability to
trade using the Condor MCM account and ultimately closing the
account, but their contractual claim fails because MCM's actions
were expressly authorized by the contracts.

did not require them to reduce the deficit in the Condor MCM
account by any specific amount or by any specific date.  This
argument fails, because even though it is true that the October
2018 Agreement did not require the plaintiffs to reduce the
deficit by a specific amount or by a specific date, they later
entered into the February 2019 Agreement, which did impose
benchmarks for reduction of the account deficit.  They do not
dispute that they breached the February 2019 Agreement by
failing to comply with those benchmarks.

Second, the plaintiffs argue that their failure to reduce
the account deficit in breach of the Agreements should be
excused because they were, at all times, working in good faith
to reduce the account deficit.  This argument is both legally
and factually unavailing.  "[A] contract that is complete, clear
and unambiguous on its face must be enforced according to the
plain meaning of its terms." Utica Mut. Ins. Co. v. Fireman's
Fund Ins. Co., 957 F.3d 337, 344 (2d Cir. 2020) (citation
omitted).  The Agreements required, with no qualification, that
the plaintiffs reduce the deficit in the Condor MCM account
below certain thresholds by certain dates.  This Court cannot
rewrite the unambiguous language of the Agreements to give them
the meaning that the plaintiffs prefer.

Moreover, the evidence elicited at trial revealed that the plaintiffs did not make a good faith effort to comply with the Agreements.  After the plaintiffs entered into the October 2018 Agreement, Condor received in the Condor MCM account almost $1 million in rebates for its market making activities.  Instead of using those funds to reduce the account deficit, the funds were transferred out of the Condor MCM account.  In transferring the funds out of the Condor MCM account, the plaintiffs violated the October 2018 Agreement, which put monthly caps on the amount of money that could be transferred out of the account.  After entering the February 2019 Agreement, which obligated Condor to use any rebate funds it received to reduce its deficit, the plaintiffs nonetheless transferred out of the Condor MCM account hundreds of thousands of dollars in rebate revenue.  A significant fraction of this money was never returned to the Condor MCM account.  In sum, even if the Court could read into the Agreements provisions excusing non-compliance with the deficit benchmarks, the plaintiffs' conduct was far from a good faith effort.

Third, they contend that when MCM entered into the February 2019 Agreement, it knew that the plaintiffs "did not have additional funds" and would only be able to reduce their deficit by liquidating a significant number of EFS positions, which had

a risk of increasing the Condor MCM account deficit in the short run.  They claim that MCM had orally modified the February 2019 Agreement to permit the use of that strategy.  Thus, by closing the account because the Condor MCM account deficit on February 28, 2019 was above the benchmark for that date set by the February 2019 Agreement, MCM effectively closed the Condor MCM account as a result of transactions it had "specifically ratified" through an oral modification.

This argument lacks merit.  The plaintiffs offer no evidence, beyond Fleisig's self-serving testimony, in support of their contention that MCM agreed to an oral modification of the February 2019 Agreement.  Even if the plaintiffs had mustered some evidence that a representative of MCM made an oral modification of the February 2019 Agreement, that purported oral agreement would be insufficient to modify the agreement's written terms.  The February 2019 Agreement modified the Customer Agreement, and the Customer Agreement provided that "[a]ny alteration to the terms of the Agreement must be . . . documented in a separate writing."  Under New York law, this contract language bars an oral modification defense.  Israel v. Chabra, 537 F.3d 86, 97 (2d Cir. 2008).  Moreover, even if an oral modification by MCM meant that the plaintiffs did not breach the February 2019 Agreement by maintaining on February

28, 2019 an account deficit beyond the threshold permitted by the February 2019 Agreement, this argument does not address the plaintiffs' numerous other breaches of the Customer Agreement for which MCM seeks damages.

Finally, they argue that even if MCM is entitled to recover for the plaintiffs' breach of the agreements, it is not entitled to recover the claimed $1,762,266.57 because it has failed to mitigate damages.  The plaintiffs suggest that MCM failed to mitigate its damages because it liquidated the positions in the Condor MCM account in a disorderly and unreasonable fashion.

Under New York law, a non-breaching party in a breach of contract action is "under a duty to mitigate damages to the extent practicable."  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 n.21 (2d Cir. 2007).  The duty to mitigate is an affirmative defense under New York law.  Valley Nat. Bank v. Gurba, 149 A.D.3d 412, 412 (1st Dep't. 2017).  Accordingly, the party asserting this defense bears the burden of establishing both its adversary's failure "to make diligent efforts to mitigate its damages" and "the extent to which such efforts would have diminished its damages."  LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 47 A.D.3d 103, 107 (1st Dep't. 2007).

These principles preclude the plaintiffs' invocation of the defense of failure to mitigate damages.  The plaintiffs have offered no admissible evidence that MCM failed to mitigate damages by properly liquidating the Condor MCM account.[18]  The evidence presented at trial is that MCM followed the plaintiffs' own approach to liquidating the positions in the account.

Because MCM has established that Condor breached its contracts with MCM, Condor is liable to MCM for $1,762,266.57.[19]  Pursuant to the Guaranty between Fleisig and MCM, Fleisig is liable to MCM for $803,113.81, the full sum of Condor's liability less the Judgment.

The award shall include prejudgment interest, which is awarded as a matter of right under New York law in cases involving breach of contract.  N.Y. C.P.L.R. § 5001(a).  Prejudgment interest shall accrue at the statutory rate of nine

---

[18] While the plaintiffs submitted a purported calculation of damages that set forth the basis for their contention that MCM failed to mitigate damages, MCM objected to this material as untimely, and this Court struck the disputed evidence in an Order of June 18, 2021.  Moreover, even if the calculation of damages were admitted, it would not change the analysis.  The plaintiffs' calculation of damages relies on Fleisig's bare assertions regarding the proper means of liquidating the account and does not provide a basis for concluding that MCM failed to mitigate damages.  It does not, for instance, demonstrate that MCM deviated from reasonable practices among futures commission merchants in liquidating the Condor MCM account.

[19] This liability accounts for the $700,000 recovered from a third-party guarantor of Condor.

percent annually.  N.Y. C.P.L.R. § 5004.  Under New York law,
"[i]nterest shall be computed from the earliest ascertainable
date the cause of action existed," but where, as here, "damages
were incurred at various times, the Court may fix a "single
reasonable intermediate date" for the calculation of damages.
N.Y. C.P.L.R. § 5001(b).  The Court sets February 28, 2019 --
the final day on which the plaintiffs were permitted to trade in
the Condor MCM account, and the date on which MCM could first
conclude that the plaintiffs had breached the deficit benchmarks
of the February 2019 Agreement -- as the date upon which
prejudgment interest began to accrue.

    B.   Indemnification and Attorneys' Fees

    Under the Customer Agreement, Condor is bound to indemnify
MCM for any "liability, damage, cost, or expense" incurred by
MCM as a result of Condor's violation of the Customer Agreement.
This indemnification provision encompasses any "direct or
indirect costs" of collection, including "interest, legal fees,
court costs, and other expenses."  Similarly, the Guaranty
provides that Fleisig will pay "any and all reasonable legal
fees, costs, and other expenses" incurred by MCM in enforcing
the Customer Agreement.

    The parties do not dispute that these provisions are
enforceable.  Moreover, New York law permits the enforcement of
this provision: under New York law, "a promise by one party to a

contract to indemnify the other for attorney's fees incurred in litigation between them" is enforceable when the "intention to do so is unmistakably clear from the language of the promise." Hooper Associates, Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989).  The language of the provisions in the Customer Agreement and the Guaranty, which both expressly provide for reimbursement of MCM's attorneys' fees, is "unmistakably clear" under this standard.  Accordingly, MCM is entitled to attorneys' fees and costs from Fleisig and Condor.

### Conclusion

MCM is awarded $1,762,266.57 from Condor and $803,113.81 from Fleisig, plus prejudgment interest from February 28, 2019 at a rate of 9%.  MCM is also awarded attorneys' fees and costs. A scheduling order addressing the calculation of attorneys' fees and costs accompanies this Opinion.

Dated:    New York, New York
          June 30, 2021

_____
DENISE COTE
United States District Judge